IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ROBERT CONNOLLY, JR.,   )
           )
      Plaintiff, )
           )
v.            )   CIVIL ACTION NO. 06-1462
           )
           )
THE PEPSI BOTTLING GROUP, L.L.C., )
           )
      Defendant. )

## MEMORANDUM OPINION

CONTI, District Judge.

   In this memorandum opinion, the court considers the motion for summary judgment

(Docket No. 20) filed by defendant Bottling Group, LLC d/b/a The Pepsi Bottling Group, Inc.

("PBG" or "defendant"),[1] against all claims asserted by plaintiff Robert Connolly, Jr.

("Connolly" or "plaintiff") under the Age Discrimination in Employment Act, 29 U.S.C. §§ 621

*et seq.* ("ADEA"). After considering the joint statement of material facts ("J.S.")[2] and the other

submissions of the parties, and drawing all reasonable inferences in favor of plaintiff, defendant's

motion for summary judgment will be granted for the reasons set forth below.

---

[1]According to defendant, PBG is incorrectly identified in the complaint as "The Pepsi Bottling Group, L.L.C." PBG's correct name is "Bottling Group, LLC d/b/a The Pepsi Bottling Group, Inc."

[2]The Joint Concise Statement of Material Facts consists of defendant's statement of material facts with plaintiff's answers in section I, containing paragraphs 1-95 on pages 2-28, and plaintiff's statement of material facts with defendant's answers in section II, containing paragraphs 1-152 on pages 29-69. To avoid any confusion that could arise from the duplicative paragraph numbers, citations to the joint statement will be referenced as J.S. I or J.S. II followed by the appropriate paragraph number.

## Factual and Procedural Background

### Defendant and its Management

Defendant manufactures, bottles and distributes consumer beverage products. (J.S. I ¶ 1). Defendant maintains a facility at 400 Graham Street, McKees Rocks, Pennsylvania, which is situated in defendant's Western Pennsylvania market unit. (J.S. I ¶¶ 2, 3). During the relevant time period, the vice president and general manager of the market unit was Lisa Sarneso ("Sarneso") and the regional human resource manager was Patrick Flynn ("Flynn"). (J.S. I ¶¶ 4, 6). The senior compliance and control manager for the market unit was Wayne Saville ("Saville"). (J.S. I ¶ 8). Terry McKinney ("McKinney") was the senior director for corporate security for PBG. (J.S. I ¶ 5). PBG's director of human resources was Susan Hoffman ("Hoffman"). (J.S. I ¶ 7).

### Connolly's Employment

Plaintiff began his employment with defendant in 1972. (J.S. I ¶ 9). In 1996, Connolly advanced to the position of business development manager ("BDM") in the on-premise business segment for PBG. (J.S. I ¶ 11). As a BDM, Connolly was responsible for developing business within his business group. (J.S. I ¶1 2). In February 2004, Connolly was transferred to a key account manager ("KAM") position in the McKees Rocks facility when his BDM position was eliminated. (J.S. I ¶ 13). As a KAM, Connolly was assigned "third-party operator" customer accounts to manage, including the University of Pittsburgh Medical Center ("UPMC") account. (J.S. I ¶ 14).

Bill Dillon ("Dillon") was hired as PBG's director of food service in March 2005, and became Connolly's direct supervisor. (J.S. I ¶ 15). Connolly alleges that on Dillon's first day of

employment with PBG, Dillon referred to Connolly as "the old man in the group."  (J.S. I ¶ 86).
In October 2005, Connolly was given a below target rating by Dillon, the first time in his career
with PBG that he had received a negative rating.  (J.S. II ¶¶ 19, 20).  On October 14, 2005,
Connolly was placed on a performance improvement plan ("PIP") by PBG.  (J.S. I ¶ 17).  The
PIP was extended in January 2006 for ninety days.  (J.S. I ¶ 18).

In November or December 2005 an argument occurred between Connolly and Dillon
during which, according to Connolly, Dillon said to him, "Listen, old man, I know you're lying
to me."  (J.S. I ¶ 85).  In a meeting on February 3, 2006, Connolly asserts that Dillon called him a
"legacy liability" and that he "could hire two or three people for what [Connolly made]."  (J.S. I ¶
87).

Connolly avers that, at some point during 2005, Sarneso said to him, "the job has passed
[you] by" and "younger key account managers can work rings around you."  (J.S. I ¶ 89).
Additionally, Connolly claims that on June 14, 2005, Sarneso stated that he "did not fit the mold
for a trainer."  (J.S. I ¶ 91).

### Contracts between PBG and UPMC

Connolly, on behalf of PBG, negotiated a contract between PBG and UPMC in 1997,
providing for the supply of Pepsi products to UPMC facilities.  (J.S. I ¶20).  UPMC's director of
corporate purchasing, Bill O'Connor ("O'Connor") participated in negotiating the contract on
behalf of UPMC.  (J.S. I ¶ 22).  The term of that contract expired on July 31, 2002.  (J.S. I ¶ 21).
The contract between PBG and UPMC was renegotiated in 2002, and Connolly and O'Connor
again were involved.  (J.S. I ¶ 23).  Two different versions of a contract entitled "UPMC/Pepsi
Bottling Group Fountain Bottle Can and Full Service Vending Sales Agreement" (the

"UPMC/PBG Contract") were signed on December 11, 2002, by Connolly on behalf of PBG and O'Connor on behalf of UPMC. (J.S. I ¶ 24).

O'Connor's employment was terminated in October 2005 by UPMC. (J.S. I ¶ 29). Bob Cutone ("Cutone") on behalf of UPMC took over responsibility for the UPMC/PBG Contract in March or April 2006. (J.S. I ¶ 30).

Connolly during a meeting with Cutone in May 2006 informed Cutone that the UPMC version of the contract was not the correct contract. (J.S. I ¶ 33). Cutone was provided a copy of the PBG version of the contract by Connolly later that month. (J.S. I ¶ 35). Cutone informed Connolly that UPMC had no record of the PBG version. (J.S. I ¶ 36). PBG learned in June 2006 that the version of the UPMC/PBG Contract that UPMC had in its files was different than the version contained in PBG's files.[3] (J.S. I ¶ 31). O'Connor testified at his deposition on July 26, 2007, that he believed that the wrong contract was placed in UPMC's files and should have been shredded. (J.S. II ¶¶ 63-64; O'Connor Dep. 51-54, July 26, 2007). PBG had no record in its files of the UPMC version of the contract. (J.S. I ¶ 32).

Cutone's supervisor, Clyde Hardt ("Hardt"), notified PBG that UPMC had serious concerns regarding its relationship with PBG and that UPMC wanted back-up documentation regarding certain marketing fund expenditures made by PBG on UPMC's behalf. (J.S. I ¶ 37). Hardt further informed PBG that UPMC was conducting an internal investigation and audit. (J.S. I ¶ 38). Among the expenditures in issue were the purchase of a crew boat for the North Catholic High School rowing team and Pittsburgh Steelers' season tickets. (J.S. II ¶¶ 78, 88).

---

[3]As the parties have done throughout their submissions to the court, the version of the UPMC/PBG Contract contained in PBG's files will be referred to as the "PBG version" and the version contained in UPMC's files will be referred to as the "UPMC version."

O'Connor testified during his deposition in 2007 that he had the approval of his supervisors to support activities at North Catholic and advised them that the crew boat was being purchased. (J.S. II ¶¶ 69-70, 72; O'Connor Dep. 74-76). Connolly submitted a request to expend UPMC marketing funds for the crew boat which was approved by a BDM. (J.S. II ¶¶ 78-79). Unbeknown to Connolly, O'Connor's son at that time was a member of the North Catholic High School rowing team. (J.S. II ¶ 83). O'Connor testified during his deposition in 2007 that he gave Connolly permission to charge the Steelers' tickets to UPMC's marketing funds. (J.S. II ¶ 88; O'Connor Dep. 69).

On June 2, 2006, Dillon met with Hardt and Cutone at UPMC's request. (J.S. I ¶ 39). UPMC representatives requested that Connolly not attend that meeting because they were upset with him. (J.S. I ¶ 40). At that meeting, as well as at a June 12, 2006 meeting, UPMC apprised PBG that the version of the UPMC/PBG Contract held by UPMC was different than the version Connolly provided to Cutone in May 2006. (J.S. I ¶ 41). A number of material differences existed between the two versions of the contract, including the following:

- PBG did not have right of first refusal on successor contracts in the UPMC version;

- a clause providing for $175,000 in yearly "Special Event Support" marketing funds that PBG would make available to UPMC was not found in the UPMC version;

- a proviso that Pepsi products would be the exclusive beverage products sold was absent in the UPMC version;

- a proviso for price adjustment due to market conditions was not in the PBG version; and

- the two versions had different commencement dates (one being August 1, 2002 and the other being December 1, 2002).

(J.S. I ¶ 42).

PBG began an internal investigation concerning the two different versions of the UPMC/PBG contract. (J.S. I ¶ 44). The investigation was conducted by Saville, McKinney, Flynn and Dillon. (J.S. I ¶ 45). The investigation included, among other things, a review of documents relating to the marketing funds expended by PBG and an interview of Connolly. (J.S. I ¶ 46). PBG suspended Connolly on June 8, 2006, pending the results of the investigation. (J.S. I ¶¶ 47, 48).

Prior to June 12, 2006, Connolly had not notified his superiors about the existence of the two versions of the PBG/UPMC contract. (J.S. I ¶ 49). A meeting occurred on June 12, 2006, attended by Saville, McKinney, Dillon and Flynn from PBG and Cutone, Linn Swanson and Cynthia Howell from UPMC. (J.S. I ¶ 50). During this meeting, Cutone disclosed to PBG that Connolly and he had met in early May 2006 after Cutone took over responsibility on behalf of UPMC for the UPMC/PBG Contract. (J.S. I ¶ 51). Later that same day, Saville, McKinney, Dillon and Flynn met with Connolly. (J.S. I ¶¶ 55, 56). Connolly was asked to explain the existence of the two different versions of the UPMC/PBG contract. (J.S. I ¶ 57). At the meeting, Connolly gave multiple, incomplete and contradictory answers to PBG's questions. (J.S. I ¶ 58). Ultimately, Connolly's explanation was that he added the marketing funds provision to the UPMC/PBG Contract using a PBG contract template, and that the other changes to the contract were due to his inadvertent oversight in not conforming the remainder of the template to reflect

the intent of the parties.  (J.S. I ¶ 64).  Connolly told McKinney that he had a hard time recalling the circumstances because the event had transpired a long time ago.  (J.S. II ¶ 118).

At some point on June 12, 2006, Flynn printed a copy of Connolly's PeopleSoft Profile.[4] (J.S. II ¶ 123).  Flynn also obtained Connolly's birth date and recorded it on the PeopleSoft profile, along with the notation of Connolly age – "52 years 9 months."  (J.S. II ¶¶ 125-26).

**PBG Code of Conduct**

PBG maintained a code of conduct during Connolly's employment.  (J.S. I ¶ 70).  The code of conduct provided that employees who violated the code of conduct would be subject to disciplinary action including termination.  (J.S. I ¶ 71).  The code of conduct contained provisions dealing with business integrity, conflicts of interest and business gifts.  (J.S. I ¶ 72). The relevant provisions of the code of conduct were:

> As a PBG employee, you should always act in the best interests of the Company.  This means that there should never be a conflict between your personal interests – or those of your immediate family – and the Company's interests.  You should never compete with PBG and you should never have any financial or other interest – direct or indirect – in any company with which PBG does business.  You should never let your business dealings be influenced, or appear to be influenced, by personal or family interests.

> For example, conflicts of interest could arise if you or an immediate family member:

> Own an interest in or work for a customer, supplier or competitor (other than an interest though [sic] a publicly traded mutual fund). Perform work or service for another company that interferes with your responsibilities to PBG.

---

[4]PeopleSoft is an internal PBG personnel record that lists an employee's personal information as well as his or her history with the company, but it does not contain birth dates. (Pl.'s App. Ex. 3).

> Request or accept gifts, loans or favors, unless they are consistent with normal business practices and of nominal value, from an existing or potential customer or supplier.
>
> Use PBG's confidential information for your own benefit or the benefit of others.
>
> Benefit from a business venture or opportunity that is related to PBG's business and that you learn of or develop in the course of your employment. . . .

Our business decisions are made on merit. Therefore your should never offer or give – directly or indirectly – anything of value to a customer or influence or reward an action in violation of PBG's or a customer's policy. Inexpensive promotional items, such as T-shirts and hats, are generally of nominal value and do not violate this policy. Any gifts of value, however, including meals, trips, entertainment and "dealer loaders," are subject to this policy.

Generally, you may only give a gift or incentive to a business partner if it serves a business purpose and has been approved by your manager. Because of the appearance of impropriety, gifts or cash should never ben [sic] given to a customer, supplier or other business partner, regardless of amount.

Further, it is your responsibility to ensure that: (1) the person to whom you give the business gift is authorized to receive it and that such receipt has been approved by the receiving party's manager, (2) that the receipt of it will not violate the business partner's internal company policies and (3) that the gift does not violate any applicable law. . . .

(J.S. II ¶¶ 151-52). During his employment, Connolly was aware of and acknowledged receipt of PBG's code of conduct. (J.S. I ¶¶ 73-75)

### **Connolly's Termination**

PBG made the decision to terminate Connolly's employment during a conference call conducted at the conclusion of PBG's investigation into the two versions of the UPMC/PBG Contract. (J.S. I ¶ 77). The participants in the conference call were Sarneso, Hoffman, Saville, Flynn and Paul Snell ("Snell"), senior vice president and general manager. (J.S. I ¶ 78). The

stated reasons for Connolly's termination included his entering into two different versions of the PBG/UPMC Contract and his explanations for how the two versions came to exist.  (J.S. I ¶ 81).

During a meeting on June 19, 2006, among Connolly, Dillon and Hoffman, Hoffman informed Connolly that Connolly was being terminated for violating PBG's code of conduct. (J.S. I ¶¶ 82-83).  At this meeting, Connolly was offered a severance package.  (J.S. II ¶ 134).  A condition of receiving the benefits of the severance package was Connolly's waiver of his rights to sue PBG for, *inter alia*, age discrimination.  (J.S. II ¶ 138).  Connolly was given twenty-one days to sign the agreement, but he never did.  (J.S. II ¶¶ 140, 142).  On the date of his termination Connolly was fifty-two years old.  (J.S. I ¶ 10).

On July 23, 2006, Connolly's KAM position was filled by Richard Haig ("Haig").  (J.S. I ¶ 94; J.S. II ¶ 146.)  Haig, who was born on September 18, 1958, was over forty-seven years old at that time.  (J.S. I ¶ 95).

### Standard of Review

Federal Rule of Civil Procedure 56(c) provides that summary judgment may be granted if, drawing all inferences in favor of the nonmoving party, "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c).  A motion for summary judgment will not be defeated by the mere existence of some disputed facts, but will be defeated when there is a genuine issue of material fact.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  In determining whether the dispute is genuine, the court's function is not to weigh the evidence or to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable jury could return a verdict

for the nonmoving party. *Id*. at 249. The court is to draw all reasonable inferences in favor of

the nonmoving party. *El v. Southeastern Pa. Transp. Auth.*, 479 F.3d 232, 238 (3d Cir. 2007)

("In considering the evidence, the court should draw all reasonable inferences against the moving

party."). The United States Court of Appeals for the Third Circuit has stated:

> [I]f there is a chance that a reasonable factfinder would not accept a
> moving party's necessary propositions of fact, pre-trial judgment
> cannot be granted. Specious objections will not, of course, defeat a
> motion for summary judgment, but real questions about credibility,
> gaps in the evidence, and doubts as to the sufficiency of the movant's
> proof, will.

*Id*.

## Discussion

Plaintiff asserts a claim of age discrimination under the ADEA based upon his

termination on June 19, 2006. The ADEA makes it unlawful for an employer to discriminate

against any person with respect to compensation, terms, conditions, or privileges of employment

on the basis of age. 29 U.S.C. § 623(a)(1). The ADEA's protection is limited to individuals

forty years of age and older. *Id.* The Supreme Court recognized that it is often difficult for a

plaintiff to prove that an employer acted with conscious intent to discriminate. *McDonnell*

*Douglas Corp. v. Green*, 411 U.S. 792 (1973). One manner in which a plaintiff can meet this

ultimate burden of persuasion is by demonstrating that an employer's stated reason for the

challenged action is not the true reason, but rather was a pretext for unlawful discrimination.

*Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

In *McDonnell Douglas*, the Supreme Court developed the now familiar burden-shifting

framework for courts to utilize as a tool in analyzing disparate treatment claims. Both parties

agree that the *McDonnell Douglas* analysis applies to plaintiff's ADEA claim. The *McDonnell*

*Douglas* framework requires a plaintiff alleging a violation of the ADEA to first establish a prima facie case of discrimination. The prima facie case, the elements of which depend upon the kind of claim the plaintiff is alleging, "eliminates the most common nondiscriminatory reasons for the plaintiff's rejection." *Burdine*, 450 U.S. at 254. In so doing, "the prima facie case 'raises an inference of discrimination only because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors.'" *Id*.

If the plaintiff successfully demonstrates a prima facie case of discrimination, the burden of production (but not the burden of persuasion) shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment decision. *Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 644 n.5 (3d Cir. 1998). The burden on the defendant at this juncture is "relatively light," and the defendant can satisfy this burden "by introducing evidence which, *taken as true*, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision." *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994) (emphasis added) (citations omitted).

Once the defendant offers a legitimate, nondiscriminatory reason for the challenged conduct at issue, "'the *McDonnell Douglas* framework - with its presumptions and burdens' - disappear[s], . . . and the sole remaining issue [is] 'discrimination *vel non*,' . . . ." *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 142-43 (2000) (citations omitted). The plaintiff, thus, has the ultimate burden of proving by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were pretext for discrimination. *Jones v. Sch. Dist. of Phila.,* 198 F.3d 403, 410 (3d Cir. 1999).

## A.  **Prima Facie Case**

To state a claim for discrimination under the ADEA, a plaintiff ordinarily must show by a preponderance of the evidence that he: (1) was at least forty years of age; (2) was qualified for the position; (3) suffered an adverse employment decision; and (4) was replaced by a significantly younger person to permit an inference of discrimination.  *See Brewer v. Quaker State Oil Ref. Corp.*, 72 F.3d 326, 330 (3d Cir. 1995).

It is uncontested that the first three elements of a prima facie case are met here:  plaintiff is a member of the protected class; he was qualified for the position; and his termination constituted an adverse employment decision.  The issue with respect to the prima facie case relates to the fourth element – whether plaintiff was replaced by a significantly younger individual.

The United States Court of Appeals for the Third Circuit has recognized that the fourth element in the prima facie case of age discrimination is satisfied by showing that the employer retained a "sufficiently younger" employee.  In applying this standard, the court of appeals in *Showalter v. Univ. of Pittsburgh Med. Ctr.*, 190 F.3d 231, 235 (3d Cir. 1999), clarified that the "sufficiently younger" employee who was retained does not need to be outside of the protected class, as was previously required in age discrimination cases.  The court of appeals stated that, "there can be no greater inference of age discrimination . . . when a 40 year-old is replaced by a 39 year-old than when a 56 year-old is replaced by a 40 year-old."  *Id.* at 235-36.  In *Showalter*, the court held that a plaintiff who was eight years older than one employee and sixteen years older than the other employee retained had demonstrated a sufficient age difference to suggest an inference of age discrimination.  *Showalter*, 190 F. 3d at 236.

The court of appeals has suggested that if a plaintiff can point to a sufficient age difference between the plaintiff and the replacement, "a fact-finder can reasonably conclude that the employment decision was made on the basis of age." *Sempier v. Johnson & Higgins*, 45 F.3d 724, 729 (3d Cir. 1995). The court of appeals has not clearly articulated a particular age difference that must be shown. *Id.* at 729 (citing *Mayfield v. Sinclair Intern'l*, 766 F.2d 788, 792 (3d Cir.), *cert. denied*, 474 U.S. 105 (1985). In one decision a five-year difference was sufficient, *id.* (citing *Douglas v. Anderson*, 656 F.2d 528 (9th Cir,. 1981)), while in another decision a one-year difference was not, *id.* (citing *Gray v. York Newspapers, Inc.*, 957 F.2d 1070, 1087 (3d Cir. 1992)).

Defendant replaced plaintiff with an employee approximately five years younger than plaintiff. Of course, there is no bright line rule to determine whether a replacement is "sufficiently" younger than a claimant. Plaintiff is correct in that the United States Court of Appeals for the Third Circuit has stated that "we have repeatedly emphasized that the requirements of the prima facie case are flexible, and in particular that 'the fourth element must be relaxed in certain circumstances.'" *Pivirotto v. Innovative Sys. Inc.*, 191 F.3d 344, 357 (3d Cir. 1999) (quoting *Torre v. Casio, Inc.*, 42 F.3d 825, 831 (3d Cir. 1994)). Keeping in mind that establishing a prima facie case is not intended to be an onerous burden on plaintiff, *Burdine*, 450 U.S. at 253, and allowing plaintiff all reasonable inferences, the court finds that, while this is a close question, plaintiff met his burden of establishing a prima facie case by adducing evidence that an individual approximately five years younger than plaintiff was hired to replace plaintiff.

### B. **Defendant's Showing of Legitimate, Non-discriminatory Reason**

Defendant's stated legitimate, non-discriminatory reason for terminating plaintiff was plaintiff's violation of defendant's code of conduct. Specifically, defendant asserts, among other things, that plaintiff was terminated for entering into two materially different contracts with the same customer on the same day, giving rise to an appearance of impropriety, and his multiple, incomplete and contradictory explanations when questioned about the two contracts. Not only did this conduct arguably violate the conflicts of interest and business gifts and payments subsections of the conducting business with integrity section of defendant's code of conduct, it also put into jeopardy defendant's business relationship with a major account. Defendant furnished ample documentation to support its position that its true reason for terminating plaintiff related to plaintiff signing two different versions of the PBG/UPMC Contract. Recognizing that the burden on defendant is "relatively light," and defendant can satisfy this burden "by introducing evidence which, taken as true, would permit the conclusion that there was a non-discriminatory reason for the unfavorable employment decision," *Fuentes*, 32 F.3d at 763, the court is satisfied that defendant set forth a legitimate, non-discriminatory reason for plaintiff's termination and met its burden of production.

### C. **Pretext**

The final issue that the court must address with respect to summary judgment in this case is the last part of the *McDonnell-Douglas* framework: whether plaintiff can demonstrate that defendant's stated reason for his termination was a pretext for age discrimination. The United States Court of Appeals for the Third Circuit has developed the following two-prong test (the "*Fuentes* test") that a plaintiff must meet to show pretext:

14

> [T]o defeat summary judgment when the [employer] [articulates]
> legitimate non-discriminatory reasons for its action, the plaintiff
> must point to some evidence, direct or circumstantial, from which
> a factfinder could reasonably either (1) disbelieve the employer's
> articulated legitimate reasons; or (2) believe that an invidious
> discriminatory reason was more likely than not a motivating or
> determinative cause of the employer's action.

*Fuentes,* 32 F.3d at 764 ("plaintiff . . . may defeat a motion for summary judgment by *either* (i)

discrediting the proffered reasons, either circumstantially or directly, or (ii) adducing evidence,

whether circumstantial or direct, that discrimination was more likely than not a motivating or

determinative cause of the adverse employment action.") (emphasis in original); *see Doe v.*

*C.A.R.S. Prot. Plus, Inc.*, 527 F.3d 358, 370 (3d Cir. 2008) ("Put another way, to avoid summary

judgment the plaintiff's evidence rebutting the employer's proffered legitimate reasons must

allow a fact-finder reasonably to infer that each of the employer's proffered non-discriminatory

reasons was either a *post hoc* fabrication or otherwise did not actually motivate the employment

action (that is, that the proffered reason is a pretext)."). The two prongs of the *Fuentes* test are

distinct. The court will analyze both prongs of the *Fuentes* test to determine whether sufficient

evidence was presented by plaintiff to defeat defendant's motion for summary judgment. *See*

*Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1108-13 (3d Cir. 1997) (analyzing ADEA

action under both prongs of *Fuentes* framework).

### 1. Prong One of *Fuentes* Test

Prong one of the *Fuentes* test focuses on whether the plaintiff submitted evidence from

which a fact-finder could reasonably disbelieve the employer's articulated legitimate reasons for

the plaintiff's termination. Under this prong, the plaintiff must point to

15

weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons [such] that a reasonable factfinder could rationally find them "unworthy of credence" and hence infer that the proffered nondiscriminatory reason "did not actually motivate" the employer's action.

*Simpson*, 142 F.3d at 644. The district court under this prong must focus on the legitimate, non-discriminatory reason offered by the employer. *Ezold v. Wolf, Block, Schorr and Solis-Cohen*, 983 F.2d 509, 531 (3d Cir. 1992) (stating that a "plaintiff does not establish pretext, however, by pointing to criticisms of members of the non-protected class, or commendation of the plaintiff, in categories the defendant says it did not rely upon . . . ."). The court is neither permitted to get involved in the subjective business decisions of the employer, nor set its own employment standards for the employer, unless there is evidence of discrimination. *Id.* at 527.

Cases analyzed under this prong usually survive a motion for summary judgment when the employer's stated reason for termination is so implausible that a reasonable fact-finder could not believe it. For example, in *Brewer v. Quaker State Oil Refining Corp.*, 72 F.3d 326 (3d Cir. 1995), the plaintiff was terminated for deficient sales performance. The evidence of record, however, disclosed that Brewer received a bonus three months before he was fired and that he was the only sales representative in the region who had received such a bonus. *Id.* at 329. The court held that, where the primary measure of Brewer's performance was sales and he was the leading salesperson in the region, his employer's stated reason for his termination was contradictory to its admission that the most important standard of job performance is sales. *Id.* at 332. According to the court, "[a] fact-finder could find it implausible that Quaker State would have fired Brewer for such deficiencies when he was successful in the sole area identified by Quaker State's own performance incentive program - sales." *Id.*

16

Similarly, in *Sempier v. Johnson and Higgins*, 45 F.3d 724 (3d Cir. 1995), the employer stated that Sempier was terminated based upon poor performance that caused the company to restructure the nature of his responsibilities. The evidence of record, however, disclosed that (1) Sempier never received any unfavorable criticism that his performance was poor or inadequate; and (2) the employer failed to produce any other evidence of poor performance or to make specific allegations of Sempier's deficiencies. *Id.* at 731-33. Thus, there was evidence on the record that a reasonable fact-finder could conclude that the reason given by Sempier's employer was a pretext for age discrimination. *Id.* at 732-33.

It is not the function of this court to determine whether defendant's business judgment in terminating plaintiff was correct. Rather, the court must view the evidence to determine whether defendant's stated reasons for terminating plaintiff could reasonably be found by a jury to be pretextual. Unlike the facts in *Brewer* or *Sempier*, here there is substantial undisputed evidence of record that supports defendant's proffered reason for plaintiff's termination. Plaintiff does not dispute that 1) he signed two different versions of the PBG/UPMC Contract on the same day, which had different commencement dates, 2) he never told his supervisors about the two different versions until after UPMC brought the issue to PBG's attention, 3) UPMC representatives were upset with Connolly, and 4) Connolly gave PBG representatives multiple, incomplete and contradictory answers to questions about why two different versions existed.

Plaintiff does dispute whether his conduct violated the code of conduct. Plaintiff points to the testimony of O'Connor during his deposition in July 2007 that the reason for UPMC's file copy of the contract being different from PBG's version was that UPMC simply placed the wrong version in its file. O'Connor, whose employment with UPMC had terminated

approximately seven months prior to his successor at UPMC learning of the two versions, testified at his deposition that the incorrect version was kept and should have been shredded. There, however, is no evidence of record that the PBG representatives, who made the decision to terminate Connolly, knew at the time of that decision in June 2005 that O'Connor was aware of the different versions and that an incorrect version been placed in UPMC's files. Plaintiff also asserts that the expenditures made under the PBG version of the contract were appropriate. Plaintiff states that the expenditures were approved by personnel at PBG as required. Plaintiff, however, did not adduce evidence that persons approving the appropriations were aware at the time of approval that two different versions of the contract in issue existed. There is no evidence of record that the PBG representatives who made the decision to terminate plaintiff in June 2005 knew at that time that O'Connor, as he testified in his deposition in July 2007, had approved the expenditures for the crew boat and the Pittsburgh Steelers' tickets. There also is no evidence of record that the PBG representatives knew at that time of Connolly's termination that he was unaware that O'Connor's son was a member of the North Catholic High School rowing team.

The evidence of record with respect to the information known to the PBG representatives at the time of plaintiff's termination is that PBG's customer, UPMC, was upset with Connolly, that there were two different versions of the same contract which had been signed on the same day, and that Connolly gave multiple, incomplete and contradictory answers to questions about why the two different versions existed. Given the undisputed facts and the absence of any evidence being adduced that the PBG representatives knew at the time of Connolly's termination that O'Connor was aware of the different versions, that the version in UPMC's file was incorrect and that O'Connor had approved the expenditures, there is insufficient evidence to implicate

pretext.  While in hindsight one could argue that, given the evidence presented to this court, Connolly did not violate the code of conduct, the court cannot replace the defendant's business judgment which was based upon the information known at the time of the termination with a judgment made after additional mitigating evidence, not known at the time of the decision, was presented.  *See Doan v. Seagate Tech. Inc.,* 82 F.3d 974, 978 (10th Cir. 1996) ("Financial evidence suggesting that a decision, in hindsight, may not have been prudent is not evidence of improper motive; the ADEA is not violated by erroneous or even illogical business judgment."); *Brown v. Holy Name Church*, 80 F. Supp. 2d. 1261, 1270 (D. Wyo. 2000) ("the employer's articulated legitimate business reason does not become pretextual even if it turns out to be, in hindsight, an exercise of bad business judgment.").   Under these circumstances, the court concludes that a reasonable fact-finder could not conclude that the defendant's legitimate non-discriminatory reason for terminating plaintiff's employment was pretextual under the first prong of the *Fuentes* test.

## 2. Prong Two

The court is next required to examine the second prong of the *Fuentes* framework to determine if plaintiff presented sufficient evidence of pretext.  This prong permits the plaintiff to survive summary judgment if he can demonstrate, through evidence of record, that "discrimination was more likely than not a motivating or determinative cause of the adverse employment action." *Fuentes*, 32 F.3d at 762.  With respect to this prong, the United States Court of Appeals for the Third Circuit has stated:

> To show that discrimination was more likely than not a cause for the employer's action, the plaintiff must point to evidence with *sufficient probative force* that a factfinder could conclude by a preponderance of the

> evidence that age was a motivating or determinative factor in the
> employment decision.

*Simpson,* 142 F.3d at 644-45 (3d Cir. 1998) (emphasis added).  The kinds of evidence relied upon by the court of appeals under this prong of the *Fuentes* analysis are: (1) whether the employer previously discriminated against the plaintiff; (2) whether the employer has discriminated against other persons within the plaintiff's protected class or within another protected class; and (3) whether the employer has treated more favorably similarly situated persons not within the protected class.  *Id.*  The court will examine whether plaintiff submitted that kind of evidence.

### a.  Evidence of previous discrimination against plaintiff

Plaintiff offers as evidence the alleged age-biased comments made by Dillon and Sarneso, Flynn's notation of plaintiff's age on plaintiff's PeopleSoft profile before the decision to terminate him was made, plaintiff being placed on the PIP, and plaintiff's replacement not being hired until the time had expired for plaintiff to accept defendant's severance package and waive any claims he had against defendant.

With respect to remarks made by upper management employees being evidence of past discrimination against a plaintiff, the United States Court of Appeals for the Third Circuit has recognized three factors to be considered in determining whether a stray remark is probative of discrimination: (1) the relationship of the speaker to the employee and within the corporate hierarchy; (2) the temporal proximity of the statement to the adverse employment decision; and (3) the purpose and content of the statement.  *Ryder v. Westinghouse Elec. Corp.*, 128 F.3d 128, 133 (3d Cir. 1997); *see Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1112 (3d Cir. 1997).

These factors must be considered *in toto* in light of the nature and context in which the comment was made. *See Keller*, 130 F.3d at 1112-13.

The *Keller* decision, which specifically addressed a comment made by a decisionmaker with respect to the second prong of the *Fuentes* test, is illustrative of this premise.[5]  In *Keller*, the plaintiff alleging age discrimination offered evidence that his immediate superior, who ultimately made the decision to terminate Keller, remarked to him: "*If you are getting too old for the job*, maybe you should hire one or two *young* bankers." *Id.* at 1111 (emphasis in original).  The court of appeals began its analysis of the comment by stating the following:

> [The supervisor's] alleged words certainly constitute evidence from which a reasonable factfinder could draw an *inference* of age-based animus, but *we do not think that these words alone could reasonably be viewed as sufficient to prove by a preponderance of the evidence* that age was a determinative cause of Keller's subsequent termination.

*Id.* at 1112 (emphasis added).  The court of appeals determined that the conversation took place four or five months prior to the time the decisionmaker decided to terminate Keller, and the comment did not refer to the specific employment question whether Keller should be terminated. *Id.*  Based upon this finding, the court of appeals determined that the comment, standing alone, lacked the probative force necessary for the plaintiff to survive summary judgment. *Id.* at 1113.

No decisions of the court of appeals were found holding that stray remarks, standing alone, could reasonably be viewed as sufficient to establish pretext under the second prong of the *Fuentes* test.  Instead, in those decisions holding that plaintiff produced sufficient evidence to

---

[5]*Keller* was an *en banc* decision of the United States Court of Appeals for the Third Circuit, giving the opinion even greater precedential value than a decision handed down by a three-judge panel.  *See Bolden v. Southeastern Pa. Transp. Auth.*, 953 F.2d 807, 813 (3d Cir. 1991) (*en banc* panel not bound by prior precedents of three-judge panels, but rather only by principles of stare decisis; *Mennen Co. v. Atlantic Mut. Ins. Co.*, 147 F.3d 287, 294 n.9 (3d Cir. 1998) (only an *en banc* decision can overturn a prior three-judge panel's opinion).

survive summary judgment, there was substantial supporting evidence other than the stray remarks to support the denial of summary judgment. For example, *Lockhart v. Westinghouse Credit Corp.*, 879 F.2d 43, 54 (3d Cir. 1989), *overruled on other grounds by Starceski v. Westinghouse Elec. Corp.*, 54 F.3d 1089 (3d Cir. 1995), is often cited for the proposition that comments made by major company executives should be viewed as cumulative statements of company policy that may be admitted in employment discrimination cases. In *Lockhart*, the defendant's senior vice-president stated that the defendant was "a seniority driven company with old management and that's going to change, 'I'm going to change that.'" *Id.* at 54. On appeal, the defendant argued that the statement was irrelevant and inadmissible because the senior executive was not associated with the company division in which Lockhart was employed. The court of appeals rejected this contention, with the oft-quoted remark:

> When a major company executive speaks, "everybody listens" in the corporate hierarchy, and when an executive's comments prove to be disadvantageous to a company's subsequent litigation posture, it can not compartmentalize this executive as if he had nothing more to do with company policy than the janitor or watchman.

*Id.* The court of appeals, thus, upheld the evidentiary ruling of the district court.[6]

In *Ezold*, which also involved comments made by a senior management official, the court of appeals considered whether several remarks made by a senior management official were sufficient evidence of gender-based discrimination. The first remark was made during Ezold's selection process to become an associate attorney at a large, Philadelphia firm, five years

---

[6]Although *Lockhart* dealt with a challenge to the relevancy of evidence admitted at trial, the opinion was cited by the court of appeals in *Brewer*, which involved an appeal from summary judgment issued by a district court. In *Brewer*, the *Lockhart* decision was cited for the general proposition that "a supervisor's statement about the employer's employment practices or managerial policy is relevant to show the corporate culture in which a company makes its employment decision, and may be used to build a circumstantial case of discrimination." *Brewer*, 72 F.3d at 333.

prior to the firm's decision not to grant Ezold partnership status.[7]  The court of appeals

determined that the first remark was insufficient because it was not temporally proximate to the

employment decision at issue, stating that it was "too remote and isolated to show independently

that unlawful discrimination rather than [the firm's] asserted reason, more likely caused the firm

to deny Ezold the partnership she sought in 1988."  *Id.* at 545.  Ezold also pointed to six other

alleged sexist remarks made by her immediate supervisor, head of the litigation section in which

she was an associate, over her five-year period of employment in an attempt to demonstrate a

discriminatory atmosphere existed at the firm.[8]  Ezold argued that these comments, taken as a

whole, were sufficient for the court to hold that her employer's reason for denying her

partnership status was a pretext for sexual discrimination.  The court of appeals, comparing

Ezold's case to *Lockhart*, rejected Ezold's argument.  *Ezold*, 983 F.2d at 546-47.  The court

noted that Ezold's case was "superficially similar" to *Lockhart* because the alleged comments

were made by a senior management official.  *Ezold*, 983 F.2d at 546.  The two cases were

factually distinct, however, because the plaintiff in *Lockhart* presented substantial other evidence

supporting the jury's verdict that age was the determinative factor in Lockhart's termination.

---

[7] The district court found the following fact to be true:
> During the selection process . . . Mr. Kurland told Mr. Ezold that it would not be easy for her at Wolf, Block because she did not fit the Wolf, Block mold since she was a woman, had not attended an Ivy League law school, and had not been on law review.

*Ezold*, 983 F.2d at 545.

[8] Plaintiff alleged that the head of the litigation section (1) singled her out at a litigation department dinner to discuss the issue of sexual harassment at the firm; (2) routinely gave her instructions to "smile" in the hallway ; (3) crudely asked her if she had any romantic encounters the previous night; (4) recounted a judge's comments regarding a murder case involving the rape of a corpse at a litigation associates' breakfast; (5) told Ezold not to refer another talented female attorney to the firm because "he did not want the problems caused by another female attorney working in the litigation department"; (6) cautioned female attorneys with children from traveling on business. *Ezold*, 983 F.2d at 546.  The district court did not make a finding that these statements were actually made, but the court of appeals considered the evidence in the light most favorable to Ezold.  *Id.*

*Ezold*, 983 F.2d at 546, 547 n.37.  The court of appeals concluded that the comments were not "sufficient in and of themselves to sustain the district court's judgment in favor of Ezold."  *Id.* at 547.

At least three other decisions rendered by the court of appeals in the employment discrimination context lend further support to the proposition that stray remarks are insufficient standing alone to defeat summary judgment.  In *Roebuck v. Drexel University*, 852 F.2d 715, 717-25 (3d Cir. 1988), a professor denied tenure brought a racial discrimination action against her university employer.  In that case, the president of the university, who had final say over the plaintiff's tenure decision, made two racially insensitive statements five years prior to the final tenure decision.  The court of appeals determined that the evidence had some probative value as evidence on the part of a key decisionmaker, stating: "Although [the] *statements standing alone, occurring as they did over five years before the final denial of tenure, could not suffice to uphold a finding [of discrimination]*, they do add support, *in combination with the other evidence, to the ultimate conclusion*."  *Id.* at 733 (emphasis added).  Thus, the statements, standing alone, were given little probative force.

The same was true in *Brewer*.  Brewer had produced evidence of a statement made by the defendant's chief executive officer in the company newsletter, in which the executive referred to two new executives as "two of our star young men in their mid-40s.  That age group is our future."  *Brewer*, 72 F.3d at 333.  The court of appeals characterized the remark as "a 'stray remark' made by a non-decisionmaker and temporally remote from the decision to terminate Brewer."  *Id.*  Despite this finding, and the court's caution that the "statement should not be given significant or commanding weight, at trial," the court determined that the comment could

be introduced at trial as circumstantial evidence of managerial policy.  In *Brewer*, however, there

was strong evidence of pretext because Brewer's employer terminated him for poor sales

performance, despite the fact that he was the only sales representative in his region to receive a

bonus for sales performance three months prior to his termination.  *Id.* at 331-32.

In *Walden v. Georgia-Pacific Corp.*, 126 F.3d 506, 521-22 (3d Cir. 1997), the court of

appeals determined that the district court did not err in excluding two remarks made by non-

decisionmakers six months prior to the plaintiff's termination.  With respect to the relevance of

the stray remarks, the court remarked:

> Although *stray remarks by non-decisionmakers alone are insufficient to establish discriminatory intent*, we have held that *such remarks can still constitute evidence of the atmosphere in which the employment decision was carried out, and therefore can be relevant to the question of retaliation*.  Such evidence "may be critical for the jury's assessment of whether a given employer was more likely than not to have acted from an unlawful motive."  Accordingly, stray remarks by nondecisionmakers may be properly used by litigants as circumstantial evidence of discrimination.
>
> Although *stray remarks by non-decisionmakers may be relevant* to proving retaliation, *we have never held that such remarks are at all times admissible*.  Rather, the district court retains its normal discretion to exclude such evidence under general relevancy principles.  *See* Fed.R.Evid. 401.  Of course, the district court must also keep in mind the import of our prior case law, noted *supra*, that stray remarks are not categorically excludable even though not directly connected to the particular employment decision at issue.

*Id.* at 521-22 (citations omitted) (emphasis added).  Thus, the court drew a distinction between

the relevancy of stray remarks to establish a circumstantial case of discrimination, with the

sufficiency of such remarks, standing alone, to survive summary judgment.  *See Doe*, 527 F.3d at

368 ("we . . . explained that [stray] remarks could provide background evidence that may be

critical to a jury's determination of whether the decision-maker was more likely than not acting out of a discriminatory motive. . . . As the Court of Appeals for the Eighth Circuit has opined, 'although . . . stray remarks, standing alone, may not give rise to an inference of discrimination, such remarks are not irrelevant.'" (quoting *Fisher v. Pharmacia & Upjohn*, 225 F.3d 915, 922 (8th Cir. 2000), and citing *Antol v. Perry*, 82 F.3d 1291, 1302 (3d Cir. 2006))).

The first remark at issue in the present case was allegedly made in March 2005, by plaintiff's direct supervisor, Dillon, who referred to plaintiff as "the old man in the group." (J.S. I ¶ 86). Dillon also made remarks to plaintiff in November or December 2005. During an argument Dillon told Connolly "[l]isten, old man, I know you're lying to me." (J.S. I ¶ 85). Later in February 2006, Dillon called Connolly a "legacy liability" and that he "could hire two or three people for what [Connolly made]." (J.S. I ¶ 87). Plaintiff points to stray remarks made by Sarneso at some point in 2005 where Sarneso told Connolly "the job has passed [you] by" and "younger key account managers can work rings around you." (J.S. I ¶ 89). On June 14, 2005, Sarneso told Connolly that he "did not fit the mold for a trainer." (J.S. I ¶ 91). Dillon was a supervisor and participated in the investigation of the two-version contract issue, but he was not a decisionmaker with respect to plaintiff's termination. Sarneso, however, who made some of the stray remarks previously described was part of the five-member group who made the decision to terminate Connolly.

The stray remarks were made several months prior to plaintiff's termination and their temporal proximity to the termination is remote. In *Keller* the court of appeals indicated that the remark in that case was not temporally proximate when it had been made four or five months prior to the adverse employment action. *Keller*, 130 F.3d at 1112. The remarks here did not

relate directly to the stated reasons for the termination and there was no evidence that any of the three other members of the five-member group who made the decision to terminate Connolly were aware of or participated in that conduct.

Plaintiff refers to Flynn's obtaining and recording Connolly's birth date on the PeopleSoft Profile at some point on June 12, 2006, and noting on the PeopleSoft Profile "52 years 9 months." (J.S. II ¶¶ 123, 125-26). Flynn was part of the five-member group who made the decision to terminate plaintiff. Plaintiff relies on *Armbruster v. Unisys Corp.*, 32 F.3d 768 (3d Cir. 1994), to argue that the notation established pretext.[9] *Armbruster*, however, is distinguishable. In *Armbruster*, the court of appeals held that documents containing age notations were evidence tending to show pretext when "[t]aken together" with comments by decisionmakers made contemporaneously with the adverse business decision. *Id*. at 783. *Armbruster* did not hold that the notation standing alone is sufficient to establish pretext, and the court declines plaintiff's invitation to so hold here.

Connolly pointed to Dillon giving Connolly, in October 2005, a negative rating which he had never received before and to being placed on a PIP which was extended for ninety days as evidence of pretext. The PIP occurred on October 14, 2005 and the extension for ninety days was in January 2006. Plaintiff, however, was not subject to the PIP at the time of his termination. With respect to the PIP and its extension, the parties dispute whether Connolly was on target or off target. There is no evidence of record, however, that the PIP was extended after April 2006, and plaintiff did not explain how the PIP supports his argument when PBG arguably

---

[9] *Armbruster*'s holding relating to the application of the fourth element of an ADEA prima facie case in the context of a reduction in force was abrogated in *Showalter v. Univ. of Pittsburgh Med. Ctr.*, 190 F.3d 231 (3d Cir. 1999). Plaintiff is not relying on *Armbruster* for that element, but rather for its discussion about pretext.

found his performance acceptable by not extending the PIP again. Under those circumstances, placing plaintiff on a PIP at some time in the past lacks probative value of discriminatory intent with respect to his termination in June 2006.

Plaintiff argues that the timing of the hiring of his replacement implicates pretext. The time of the hiring of his replacement, however, did not relate to the stated reason for plaintiff's termination and lacks probative value with respect to pretext in the circumstances of this case.

The stray comments, the reference to plaintiff's age on his PeopleSoft profile, the PIP, and the timing of the hiring of his replacement, whether considered alone or together, lack probative force in light of the undisputed evidence of record relating to the stated bases for the termination. Plaintiff failed to address the circumstances under which his conduct was being scrutinized at the time of his termination, i.e, the existence of two versions of the contract and plaintiff's multiple, incomplete and inconsistent reasons for why the two versions existed. The court concludes that pretext was not shown under those circumstances in light of the undisputed evidence adduced by defendant with respect to the non-discriminatory reason for termination. Plaintiff disputes the conclusion regarding whether his actions violated the code of conduct. The court already examined that conclusion and noted the lack of evidence in the record that the PBG representatives, who made the decision to terminate plaintiff, knew about the mitigating factors favoring plaintiff at the time that decision was made. Hindsight under the circumstances presented here does not support pretext and the court concludes that plaintiff did not present sufficient evidence for a reasonable fact-finder to determine that pretext arises from evidence of past discrimination against plaintiff.

**b. Whether the employer discriminated against other persons in plaintiff's protected class or another protected class**

Plaintiff did not present any evidence that defendant discriminated against other persons in plaintiff's protected class. Under those circumstances, the court need not consider this category.

**c. Whether employer treated more favorably similarly situated persons not within the protected class**

Plaintiff did not adduce any evidence that defendant treated more favorably similarly situated persons not within the protected class. Under those circumstances, the court need not consider this category.

## Conclusion

The crux of the issue in this case is pretext and plaintiff failed to produce sufficient evidence that tends to show defendant's legitimate non-discriminatory reason for the adverse employment action was not worthy of credence or that his age was more likely than not a motivating factor in the employment decision. The bases for defendant's proffered reason for the adverse employment are supported by undisputed evidence contained in the record. Under these circumstances, the court concludes that while plaintiff established a prima facie case of discrimination, no reasonable jury could conclude that defendant's stated, nondiscriminatory reason for terminating him was pretextual. Defendant's motion for summary judgment will be granted and judgment will be entered in favor of defendant. The clerk shall mark this case closed.

By the court:

/s/ JOY FLOWERS CONTI
Joy Flowers Conti
United States District Judge

Dated: September 22, 2008

cc:     Counsel of Record